The State of Michigan v. The Flint & Pere Marquette Railroad Company et al.

*Swamp lands—Grant to State—Railroad grant—Estoppel.*

1. That the State, as well as individuals, may be estopped by its acts, conduct, silence, and acquiescence, is established by a line of well-adjudicated cases; citing *U. S. v. Military Road Co.,* 41 Fed. Rep. 493; *U. S. v. Railway Co.,* 37 Id. 68; *U. S. v. McLaughlin,* 30 Id. 147; *Pengra v. Munz,* 29 Id. 830; *Hough v. Buchanan,* 27 Id. 328; *State v. Milk,* 11 Id. 389; *Cahn v. Barnes,* 5 Id. 326; *Com. v. Heirs of Andre,* 3 Pick. 224; *Attorney General v. Ruggles,* 59 Mich. 124,

2. Applying the principles of the above cases, and of others that might be cited, to this case, there is no escape from the conclusion that complainant's claim of title to the lands involved in this suit under and by virtue of the swamp-land grant of September 28, 1850, as against the claim of the defendants that such title passed to the Flint & Pere Marquette Railway Company under the act of Congress of June 3, 1856, granting certain lands to the State of Michigan in aid of the construction of certain railroads therein, and the act of the Legislature of said State passed February 14, 1857, conferring the lands so granted upon said railway company, subject to said acts of Congress and of the Legislature, has become stale, and that complainant is estopped from asserting title in itself to said lands; its claim having no foundation in equity, justice, or good conscience, under the facts stated in the opinion.

Appeal from Ingham. (Peck, J.) Argued February 4 and 5, 1891. Decided December 23, 1891.

Bill to remove cloud from title, for an injunction, and an accounting. Defendants appeal. Decree reversed, and bill dismissed. The facts are stated in the opinion.

*Moses Taggart* (*Roger W. Butterfield*, of counsel), for complainant, contended:

1. Act No. 187, Laws of 1851, which accepted and identified the grant of swamp lands to this State, defined the manner in which such lands should be disposed of by the Land Commissioner. They were to be sold at public auction, after 30 days' notice, at a minimum price of 75 cents per acre. The Commissioner was to issue a certificate of purchase, and, when filed with the Secretary of State, the purchaser was entitled to a patent to be executed by the Governor. The lands were not subject to private entry until offered at public auction; and section 1 of Act No. 31, Laws of 1858, expressly provided that none of those lands should be offered for sale before the State received its patent. The statute (How. Stat. §§ 5390–5449) contains imperative directions as to the manner in which swamp lands should be offered at public sale, and the kind of notice to be given. These provisions of law have been strictly construed, and the authority of the State Land Commissioner limited to the statute; citing *People v. State*

*Treasurer*, 7 Mich. 366; *People v. Pritchard*, 17 Id. 260; *People v. Pritchard*, 19 Id. 470; *Crane v. Reeder*, 22 Id. 322; *Attorney General v. Smith*, 31 Id. 359; *Attorney General v. Thomas*, Id. 365; *Robertson v. Commissioner*, 44 Id. 274.

2. If defendants' illogical position, namely, that while State officials could give no valid title to these lands by direct action except by strictly following the statute, yet by non-action they could divest the State of its title, is correct, then one State officer's failure to act, or his acquiescence in an illegal claim, is more powerful and effective than the combined efforts of all State officials upon the same subject-matter. Such is not the law; citing *Detroit v. Weber*, 26 Mich. 284; *Crane v. Reeder*, 25 Id. 303; *Attorney General v. Supervisors*, 30 Id. 388; *Detroit v. Railway Co.*, 41 Id. 413; *Railway Co. v. People*, 46 Id. 193; *People v. Brown*, 67 Ill. 435; *State v. Brewer*, 64 Ala. 287; *Pulaski Co. v. State*, 42 Ark. 118; *State v. Bevers*, 86 N. C. 588; *U. S. v. Kirkpatrick*, 9 Wheat. 735; *Lewis v. State*, 96 N. Y. 71; *King v. U. S.*, 99 U. S. 229; *Railway Co. v. Philadelphia*, 51 Penn. St. 465; *Wallace v. Maxwell*, 10 Ired. 110; *Taylor v. Shufford*, 4 Hawks, 116; Bigelow, Estop. 331 (4th ed.)

3. Sovereignty is not subject to an estoppel, nor does laches in the action of its officers so operate; citing cases last above cited, and Herm. Estop. §§ 676, 1128; *State v. Hastings*, 10 Wis. 526; *Supervisors v. Ellis*, 59 N. Y. 625; *Hunter v. U. S.*, 5 Pet. 173; *U. S. v. Van Zandt*, 11 Wheat. 184; *Filor v. U. S.*, 9 Wall. 45; *Ward v. U. S.*, 10 Id. 593; *U. S. v. Thompson*, 98 U. S. 486; *Railroad Co. v. Railroad Co.*, 109 Id. 329; *U. S. v. Railway Co.*, 118 Id. 120; *U. S. v. Beebe*, 127 Id. 338; *Lee v. Munroe*, 7 Cranch, 366; *Crane v. Reeder*, 21 Mich. 77; *People v. Swift*, 59 Id. 529; nor does a statute of limitations run against the State or the United States, unless so expressly provided by statute; citing *Crane v. Reeder*, 21 Mich. 77; *U. S. v. White*, 2 Hill, 59; *U. S. v. Herron*, 20 Wall. 251; *U. S. v. Thompson*, 98 U. S. 486; *U. S. v. Railway Co.*, 118 Id. 120; *Lindsey v. Miller*, 6 Pet. 666; and so as to remedies generally pursued, the State or United States is not debarred by statute, unless expressly subjected to it; citing *Bank v. U. S.*, 19 Wall. 227; *U. S. v. Herron*, 20 Id. 251; *State v. Board of Public Works*, 36 Ohio St. 409.

4. But the statute of limitations, under any view, cannot be held to apply to this suit, as the lands are substantially all unoccupied, and are not held adversely, and, the State being possessed of the legal title, its possession, and not that of the defendants, is presumed; citing How. Stat. § 8701; and laches cannot be imputed to one in possession for delay in resorting

to a court of equity; citing *Mills v. Lockwood*, 42 Ill. 111; *Wilson v. Byers*, 77 Id. 76; *Ruckman v. Cory*, 129 U. S. 387.

5. This suit is to quiet title, and for such auxiliary relief as it is competent for a court of equity to give. The statute (How. Stat. § 6626), as amended by Act No. 260, Laws of 1887, permits one having the legal or equitable title to land to institute a suit in equity against persons not in possession to quiet title, and under its general equity powers the court in this case can grant the relief prayed; citing *Ormsby v. Barr*, 22 Mich. 80; and the cases cited apply equally to that portion of the prayer of the bill asking for an accounting.

6. The acts and circumstances put forward by defendants lack the essential elements of estoppel, even as between individuals. It has been said that, to constitute an estoppel, there must have been a misrepresentation of a material fact, made with knowledge of the fact to a person ignorant of the matter, with the intention that it be acted upon, and that it be acted upon by the person claimed to have been aggrieved. Each and all of these conditions are entirely lacking in this record. Of course, there may be actions of a party which will operate to estop him from taking a position inconsistent therewith thereafter, but we fail to discover anything that will bring this case within any recognized rule of equitable estoppel. A transaction in which there was no concealment or misunderstanding of facts is not ground for an estoppel *in pais;* citing *Gorham v. Arnold*, 22 Mich. 247; and unless one knows there is occasion for him to speak he is not estopped; citing *Griffin v. Nichols*, 51 Mich. 575; and an unauthorized sale of land can only be ratified in writing, or by such conduct as operates as an estoppel, and such ratification must be made by a party informed of the facts; citing *Palmer v. Williams*, 24 Mich. 329; and there the other party must be misled to his prejudice; citing *De Mill v. Moffat*, 49 Mich. 125; and the acts of an agent whose authority is invalid under the statute of frauds will not estop the principal, unless adopted by him; citing *Holland v. Hoyt*, 14 Mich. 238; and one authorized to sell for cash cannot sell for credit, and if he so sells the sale is void; citing *Palmer v. Williams*, 24 Mich. 332.

7. There is no allegation or proof that the defendants or the United States officials were misled by anything done or left undone by any State officer. Ordinarily it has been held in this State that, where the law requires a deed to pass title, actions, or oral statements even, cannot have that effect; citing *Shaw v. Chambers*, 48 Mich. 359; *Nims v. Sherman*, 43 Id. 46; *De Mill v. Moffat*, 49 Id. 132.

8. It is insisted that the State is estopped from the assertion of its title because the lands have been taxed and taxes paid. Act No. 41, Laws of 1873, provided that the Auditor General should obtain from the Secretary of the Interior a full list of lands patented railroad companies "liable to taxation, and forward a copy of such lists of said lands to the county treasurer of the proper county in which the same are located." This was the extent of the requirements of the act; the county treasurers were not directed to use such lists in any manner. There is no claim that the State Legislature, when enacting this law, had knowledge that lands belonging to the State had been listed to railroad companies, or that it intended to have listed or taxed any lands not belonging to such railroad companies. The Auditor General was not authorized to list any other under the law.

9. From the evidence of Deputy Auditor General Pratt, it appears that the Auditor General corresponded with the Land Department at Washington, and obtained the descriptions of land; that letters received from the Secretary of the Interior were copied and sent to county treasurers. Mr. Pratt testifies that the only lists or information obtained as to these lands was from the office of the Secretary of the Interior, and that there was no comparison with any lists in the State Land Department; also, that he had charge of detail work in the Auditor General's office, and that such department had no knowledge that any of these lands were lands belonging to or claimed by the State. It cannot be claimed that there was laches on the part of the Auditor General, as he had a right to assume that only such lands had been patented to the railroad companies as belonged to them. But, whatever the knowledge of the Auditor General, he had no power, either directly or indirectly, to divest the State of its title to these lands; citing *Crane v. Reeder*, 25 Mich. 320; *Baker v. Johnston*, 21 Id. 319; *Ellsworth v. Grand Rapids*, 27 Id. 250; *Rogers v. Railroad Co.*, 45 Id. 460; *Railway Co. v. People*, 46 Id. 209; and the courts of other states have held to the same rule; citing *State v. Brewer*, 64 Ala. 287; *McCaslin v. State*, 99 Ind. 428; *Reid v. State*, 74 Id. 253; *St. Louis v. Gorman*, 29 Mo. 593; *U. S. v. Land-Grant Co.*, 21 Fed. Rep. 19; *Buena Vista Co. v. Railroad Co.*, 46 Iowa, 226; *Filor v. U. S.*, 9 Wall. 45; *Ward v. U. S.*, 10 Id. 593; *Railroad Co. v. Railroad Co.*, 109 U. S. 329; *Hodgdon v. Wight*, 36 Me. 326; *U. S. v. Railway Co.*, 118 U. S. 125; *State v. Pinckney*, 22 S. C. 484.

*A. A. Ellis,* Attorney General (*William G. Howard,* of counsel), for complainant.

*W. L. Webber,* for defendants, contended for the doctrine of the opinion.

GRANT, J. The bill of complaint in this case, which is on the information of the Attorney General, prays for an injunction to restrain the defendants, first,—

"From sales of any of the lands described in said Exhibit A, or from selling any timber upon said lands, or committing any waste, either directly or by their agents, and from asserting and claiming any title to said lands and premises; and that the title of the State of Michigan in and to said lands, under and by virtue of the land grant of the Congress of the United States, made September 28, 1850, may be decreed and declared to be full, complete, and absolute, which decree may stand and operate as a removal of all clouds to said title by reason of the claim or claims made by the said defendants, or any of them, or other parties interested herein, by virtue of said railroad grant or trust-deed; and that the said Flint & Pere Marquette Railroad Company, and its trustees and land commissioner, aforesaid, defendants herein, be required by the decree and order of this court to account to and with the State of Michigan, complainant herein, for any and all timber cut upon said premises directly by said defendants, or by their agents or authority, and that said complainant may have decree for any amount due it upon such an accounting."

The State of Michigan claims title to the land described in Exhibit A under and by virtue of the grant usually known as the "Swamp-Land Grant," of September 28, 1850, by the Congress of the United States.

The defendants claim to have derived their title through an act of Congress passed on or about June 3, 1856, granting to the Flint & Pere Marquette Railway Company certain lands in the State of Michigan, to aid in the construction of a railroad in said State, and the act of the Legislature of the State of Michigan passed February 14, 1857, conferring the lands upon said railway company, subject to the act of Congress and to the act of the Legislature referred to.

The claims of the respective parties will appear in the abstracts of the bill and answer, taken from the brief of the counsel for the defendants and appellants, and found at the end of the opinion.

Decree was entered in the court below for complainant, declaring the title to be in the State; that the cloud upon the title to the lands, arising from the claim of the defendants, be removed; and referring the cause to a commissioner to take evidence of State taxes paid by the defendants upon the lands, and the value of the timber cut therefrom.

I deem it necessary to discuss and determine only the question of estoppel, raised in this case; for, if the complainant is estopped to now set up title in itself to the lands in controversy, the other questions become unimportant.

That the State, as well as individuals, may be estopped by its acts, conduct, silence, and acquiescence, is established by a line of well-adjudicated cases.

In Massachusetts, in the year 1825, the commonwealth was held estopped from setting up alienage in a grantee to whom it had conveyed land. *Com. v. Heirs of Andre,* 3 Pick. 224. In that case the state had conveyed the land by deed to Andre. The court held:

"This deed must operate as a rebutter, as it would if an individual were the grantor; and with more reason, because the commonwealth is not liable to an action. The commonwealth, if the land were recovered, would feel itself bound to repay the consideration money, with interest. This would be a claim which could not be resisted without degrading the country."

It has been held that the United States government was estopped from disputing certain boundary lines, and from denying that certain lands were within them. *U. S. v. McLaughlin,* 30 Fed. Rep. 147. The court in that case said:

" A construction of the law and understanding of the facts, acted upon by all departments of the government, by the public, and even by the claimant himself, for nearly a quarter of a century, should not now be disturbed. The government should be now estopped from alleging that it [the boundary line] is or should be located elsewhere. The law of estoppel, in a proper case, applies to the government."

In *State v. Milk*, 11 Fed. Rep. 389, it is said:

" Resolute good faith should characterize the conduct of states in their dealings with individuals, and there is no reason, in morals or law, that will exempt them from the doctrine of estoppel." See, also, authorities there cited.

Where the state granted its land as a part of a wagon-road grant, which had been conveyed to the state under the swamp-land act, it was held estopped to deny that the land was within the wagon-road grant. *Cahn v. Barnes*, 5 Fed. Rep. 326. In that case the state first granted the land to the plaintiff as wagon-road land, and subsequently conveyed it to the defendant as swamp land.

The case of *Hough v. Buchanan*, 27 Fed. Rep. 328, arose under the swamp-land act, and the act of Congress granting certain lands to the state of Iowa to aid in the construction of railroads. That case is the exact parallel of this, so far as the indemnity lands are concerned. The complainants obtained their title from the railroad act, and the defendant claimed title under the swamp-land act. After reciting the facts, the court said:

"If, under these circumstances, it should now be held that the state is not debarred from asserting a claim to these lands under the swamp-land act, it is clear that a fraud would thereby be perpetrated upon the company and its grantees. Should it, however, be held that it was open to the state, or its grantees, to contest the validity of the transfer to the railway company, such

contest must certainly be made within a reasonable time. The county, upon its organization in 1859, caused these lands to be listed as swamp lands, and the list was forwarded through the proper channels to the department at Washington. The Commissioner refused to certify the lands under the swamp-land act, holding, as a matter of law, that the certification made thereof in 1858 to the railway company defeated the right to claim them under the swamp-land act. It does not appear that the county or its grantees have since taken any further action in the premises. They knew that the lands had been certified to the railway company in 1858; that the Commissioner of the Land-Office had refused to certify the lands under the swamp-land act; that the railway company and its grantees were claiming the land, and asserting title thereto by paying taxes assessed thereon; and yet for 25 years the defendant and his grantors have done nothing to perfect the evidence of their title, or assert any right to the land. Certainly their claim must be regarded as stale, and not entitled to favorable consideration at this late day."

In *Pengra v. Munz,* 29 Fed. Rep. 830, the question raised was similar to that in *Cahn v. Barnes, supra,* and the same rule was enunciated.

In *U. S. v. Railway Co.,* 37 Fed. Rep. 68, it is said:

"Parties place faith, and should place faith, in the action of the government, and rely upon the title which its patent conveys; and when, as appears in this case, many parties have purchased in perfect reliance upon the title of the patent, and many years have passed with it unchallenged, common fairness requires that the title thus apparently conveyed should be sustained, unless it be very clear that there was a want of authority to issue it."

In *Attorney. General v. Ruggles,* 59 Mich. 124, the State asked for the cancellation of certain certificates for the purchase of agricultural college lands. There, as here, counsel for the State sought to make a distinction in the doctrine of estoppel as applied to the State and individuals. But this Court, speaking through Mr. Justice MORSE, said:

"I see no reason to distinguish this case, although the State is a party, from like cases between individuals."

This brings us to a statement of the facts applicable to this branch of the case. By the act of Congress of June 3, 1856, certain alternate sections of the public lands were granted to this State to aid in the construction of certain railroads. The State, through its Legislature, by Act No. 126, Laws of 1857, accepted the grant, and provided the ways and means to carry out the trust thereby reposed in the State. Certain citizens of this State, and, I presume, some from other states, organized the Flint & Pere Marquette Railway Company, and, under the authority conferred upon it by the State, immediately commenced and prosecuted its work to completion. The territory through which the road was constructed was practically a wilderness. It is evident that it could not then have been built without this grant of lands. As an additional inducement, the State agreed to exempt the lands from taxation for a certain number of years, and gave the railroad the right of way over its own lands. The company in all respects complied with the law, and as each 20 miles of its road was completed it was inspected by the proper State officials, and the fact certified to the United States government. It then became entitled to the odd-numbered sections, corresponding to each 20 miles so constructed. If the federal government had sold or conveyed any of the lands in these odd-numbered sections, so granted, the company was entitled to a corresponding amount from other lands within certain indemnity limits. These lands were to be selected and designated by an agent appointed by the State. The lands within the six-mile limits were to be identified by the Secretary of the Interior. The grant was a "float." No patents were necessary to convey the title, but the title passed as soon as the lands were identified and certified.

The lands in controversy in this suit, in all about 16,000 acres, were selected, identified, and certified, in the years 1859 and 1860, as having been granted to the State under the railroad act of June 3, 1856. These certificates were sent to the State by the Department of the Interior, and filed in its appropriate department. From that time to the time of filing the bill in this cause, in December, 1887, the State never called in question the right of the railroad company to these lands. Meanwhile three-fourths of the lands have been sold and conveyed by the company to innocent purchasers. The lands have been improved, buildings erected, and taxes paid, both State and municipal, for many years. The railroad's claim of ownership was open and notorious. In 1871 the Legislature discussed the question of taxing them, and the company then entered its protest. In 1873 the Legislature enacted a law taxing them. The Auditor General, acting under the law, obtained from the General Land-Office at Washington, early in 1873, a list of these lands for the purpose of subjecting them to taxation. The State furnished to the various county treasurers lists of the lands within their respective counties, and they have been taxed continuously since for both State and municipal purposes. Aud. Gen. Rep. 1874. The company contested this in the United States courts, and carried the case to the court of last resort, where the right to tax them was affirmed. *Tucker v. Ferguson*, 22 Wall. 527. The company issued bonds to obtain money to construct the road, and executed a trust mortgage to secure their payment. The Auditor General, in his report for 1873, included the opinion of the United States circuit court for the western district of Michigan in the above case; also his letter to the Commissioner of the General Land-Office at Washington, asking for lists of railroad lands subject to taxation by

the act of the Legislature; stated the receipt of certain lists under date of October 13, 1873, and reported the number of acres of land belonging to the defendant company, and subject to taxation, to be 512,506.12. See Report, pp. xvi.—xxi. In his report for 1874 he includes the opinion of the Supreme Court of the United States in the same case, and says:

"Lists were received entitled as below, and giving descriptions of lands certified or patented to the several railroad companies named, and of the number of acres stated, as follows."

Among the lists so received are 11 of the lands of the defendant company, aggregating 446,814.11 acres. Pages clxx.–clxxvi.

In 1870 the company applied to the Commissioner of the State Land-Office for an examination and certification whether the State laid claim to any of these lands, at the same time presenting to him a plat-book, and requesting him to delineate thereon all swamp lands patented to the State, and all unpatented, and all claimed by the State, on the odd-numbered sections. The Commissioner made his examination and certificate showing that none of the lands were claimed by the State.

The identification of these lands, and their certification to the State, were a solemn declaration on the part of the United States that they came to the State under the railroad grant, and not under the swamp-land grant. This declaration stood for 28 years without challenge from the State, and with the evidence thereof on file in its own department. It knew that the railroad company took these lands under the railroad act, and was selling and conveying them to hundreds of its citizens for farms and other purposes; and yet it slept upon its rights until it has reaped the benefits of the construction of the railroad, and the available public

lands have in all probability been exhausted, so that the company cannot now receive the compensation it. was entitled to under the acts of Congress and the State, and until these lands have been enhanced many times in value, at the expense of the defendant company and its grantees.

No question is raised as to the good faith on the part of the railroad company and its officers, nor is it hinted that there was any collusion between the officers of the State and those of the railroad company.

Whatever may have been the effect of the arrangement made between the general government and the State in regard to identification of lands under the swamp-land act, it was certainly understood between the two governments that patents should be issued to the State as fast as the lands were identified; and the Commissioner of the State Land-Office, in his report of December 1, 1860, reported that 5,049,125.44 acres had been patented, leaving unpatented and *unadjusted* 808,336.61 acres.  The lands now involved were not patented.

The swamp-land act did not identify the land granted. Assuming that the original surveys, which .in many cases were undoubtedly fraudulent, rather than the resurveys, should govern under the arrangement made between the two governments, the record in this case shows that the field-notes of these surveys were contained in several hundred small pass-books turned over to the State Land-Office by the Surveyor General.  The complainant, therefore, had in its possession the evidences of its title.  It is urged by counsel for the State that none of its officers or agents examined or knew of the contents of these field-notes, and that this constitutes a legal excuse for not applying to it the doctrine of estoppel.  The State, therefore, seeks to apply the doctrine of estoppel to the railroad company and its grantees, but denies that it is applicable to itself.  What reason can be found for such

a position? Let us apply the case to individuals. Should A., assuming to own large tracts of land, convey certain of them to B., in trust to be conveyed to C., upon the payment of a valuable consideration, which, when paid, will inure to the benefit of B. as well as of C.; the consideration is paid; the lands conveyed; B., under the power he possesses, imposes annual burdens upon these lands for 15 years, which C. pays; B. sleeps for 28 years upon his rights, in ignorance that the title at the time of the conveyance to C. was in him; and C. has meanwhile openly and notoriously asserted his title, and dealt with the lands as his own, has mortgaged, sold, and conveyed them, and all this while the evidence of title is in the possession of B.,—would not B. be estopped to assert his title? It is said in *U. S. v. Military Road Co.*, 41 Fed. Rep. 493:

"Whatever is inequitable as between man and man, in their dealings with each other, should also be deemed inequitable as between the United States and those with whom they condescend to deal under like circumstances."

Applying the principles of the above cases, and others that might be cited, to the present case, I can find no escape from the conclusion that the claim of the complainant has become stale, and that it is now estopped to assert title in itself. The claim of the State has no foundation in equity, justice, or good conscience. The maxim that "where one of two parties, neither of whom has acted dishonestly, must suffer, he shall suffer who, by his own act, has occasioned the confidence and consequent injury of the other," applies to the present case, in which Mr. Sleeper, the Deputy Commissioner of the State Land-Office, testifies that it required the labor of three years to examine the records in that office and collate the evidence upon which he now bases the claim of the State.

The decree of the court below must be reversed, and the bill dismissed, with costs of both courts.

The other Justices concurred.

Abstracts of bill and answer, referred to on page 487 of opinion.

BILL.

1. The bill avers the passage of the swamp-land law of September 28, 1850, which it is said—

"Granted unto the several states named in the act passed at said date, including the State of Michigan, the whole of the swamp and overflowed lands made unfit for cultivation, and remaining unsold on or after the 28th day of September, A. D. 1850, for the purpose of constructing the necessary levees and drains to reclaim the swamp and overflowed lands therein."

The bill then avers that it was the duty of the Secretary of the Interior to make lists and plats of such lands, and, at the request of the governors of the said several states, to issue patents to the said states; and that, after making up the lists and plats, all legal subdivisions, the greater part whereof was wet and unfit for cultivation, were to be included in said lists and plats; and alleges that the effect of the grant was to vest title in the State to "all of the swamp and overflowed lands located therein, and of the kind and character designated in said act;" and states that the State afterwards asserted title to all such lands, and that such title was recognized by the United States.

2. The bill then shows that the method of listing, designating, and describing said land was a matter of correspondence between the Federal and State officers; that on or about November 21, 1850, certain instructions were prepared as to the method of identification by the Commissioner of the General Land-Office, of which a copy was sent to the Surveyor General, and another copy to the Governor (and the bill quotes from said instructions), by which the Surveyor was instructed to make out a list, and was authorized to look at the field-notes as a basis of the list, if the State would consent; also authorized him to act upon other satisfactory evidence, as to the character of the lands, which the State might furnish. The bill also quotes form the letter of November 21, 1850, to the Governor of Michigan from the Commissioner of the General Land-Office, suggesting inquiries as to the method of determining the character of the lands. The bill next quotes from a letter of the Surveyor General of the United States to the Governor of Michigan, and, referring to the instructions, the Surveyor General asks the Governor to inform him whether the State authorities are willing to adopt the field-notes, or whether the State authorities will have a survey made to identify the lands. The bill then sets

out that Gov. Barry wrote suggesting delay; and that on January 3, 1851, the Surveyor General wrote to the Governor, giving his opinion that the field-notes would show a greater amount of swamplands than could be found from a resurvey, and that the net proceeds to the State would be greater, and adds: "These lands are to be designated, all of them, from the notes of the surveyors in this office, unless the State authorities choose to survey."

3. The bill further states, on belief, that the survey, to which reference is made in the instructions and letters, had indicated the sections, or subdivisions of sections, of government lands "which were of a swampy character, and come within the lands conveyed by said grant of September 28, A. D. 1850;" that, pursuant to the propositions and suggestions aforesaid, the Legislature of the State of Michigan, in 1851, at the suggestion of the Governor, took the same into consideration; that by the act of June 28, 1851, the State adopted the notes of the surveyor on file in the Surveyor General's office as a basis upon which the State should receive the lands; that such legislation was known at the land department at Washington, and understood to be the basis agreed upon for the adjustment of the lands granted by said grant.

The bill then avers that this proposition and these acceptances by the State—

"Operated and had the legal effect to perfect in the State of Michigan full, complete, and absolute title to all the lands shown by the Surveyor General's minutes to be swamp and overflowed lands, and all subdivisions of land, the greater part of which appeared by said minutes to be of a swampy nature."

That the Surveyor General thereupon proceeded to prepare plats, and designate upon said plats, by lines, the lands that were of a swampy nature and character, which came within the grant; and that these marks used to designate the several pieces are made in ink, and that within such lines is written the letter, "S," to indicate that such lands are swamp lands; that pursuant to directions from Washington the Surveyor General did make maps and plats, which are now on file at Lansing—

"And which were and are the identification of the swamp lands granted to the State of Michigan by said act, and which this informant submits are effective and binding, both upon the United States and all persons claiming from them, as well as the State of Michigan."

Charges that from June 28, 1851, to the present time the State has always treated the Surveyor General's minutes, maps, and plats of the swamp lands placed thereon as binding upon the State, and "as fixing and determining the lands belonging to the State of Michigan" under said grant; and that the Federal Land Department—

"Have at all times been fully advised as to the act of the Leg-

islature of the State of Michigan in 1851, and of the claims made by said State by reason thereof."

That the act of Michigan, June 28, 1851, and the lists prepared by the Surveyor General, were reported to the General Land-Office, and that the proposal of the Commissioner of the General Land-Office as to the method of identification of said lands was approved by the Secretary of the Interior; that by such facts "the title of the State was and is, and has been at all times, full and complete" since the grant.

Shows that the claim of the State of Michigan as to the method of identifying these lands has never been repudiated by the Department of the Interior, but the preparation of the lists has been neglected by the government officials at Washington; that some of said lands have been patented to the State. As to others, lists have been prepared, and certified to the State. As to others, lists have been prepared, and not certified to the State. As to still other descriptions, no lists whatever have been prepared, although the Federal Land-Office has been frequently requested to certify and patent said lands to the State.

Charges that Exhibit A, annexed to the information, contains a list of a part of "the swamp and overflowed lands" which were granted to the State by said act, and—

"Which are shown to be swamp and overflowed lands, as this informant alleges, by the Surveyor General's minutes, and the plats and maps prepared by him, and filed in the office of the Land Commissioner for the State of Michigan, and the title to which is now in the State of Michigan, by virtue of said grant and acceptance as aforesaid, and which said lands your informant alleges are swamp and overflowed lands, within the true intent and meaning of said grant."

4. Alleges that June 3, 1856, Congress granted lands to Michigan to aid in the construction of railroads therein, and that the Legislature of Michigan by the act of February 14, 1857, conferred upon the Flint & Pere Marquette Railway Company said lands, franchises, powers, and privileges to aid in the construction of its railroad; that thereafter the Flint & Pere Marquette Railway Company went into the hands of a receiver, and was subsequently reorganized as the Flint & Pere Marquette Railroad Company,—

"Which company took all the lands, rights, and interests therein held by the Flint & Pere Marquette Railway Company, and still holds, and claims to own, the said lands." States that "the Flint & Pere Marquette Railroad Company appointed an agent to select lands under said act of Congress, as well as that of the Legislature of the State of Michigan, above referred to, and induced the Commissioner of the General Land-Office to certify the same to the said Flint & Pere Marquette Railroad Company, including the lands set forth and described in Exhibit A, hereto attached, which lists are filed in the office of the State Land Commissioner at Lansing, and

contain the following proviso: 'Subject to all its conditions (that is, the conditions of said grant), or to any valid interfering rights which may exist, or any of the terms imposed in the foregoing lists;' referring to the lists of lands certified to the Flint & Pere Marquette Railroad Company."

States that the lands in Exhibit A have been certified to the Flint & Pere Marquette Railroad Company, but the bill cannot state to what extent or what part of said lands have been patented to the Flint & Pere Marquette Railroad Company.

5. Shows that the Flint & Pere Marquette Railroad Company was a corporation under the laws of Michigan; that "the said Flint & Pere Marquette Railroad Company conveyed all of its interests in said lands" to Prescott and Crapo, as trustees, to secure bonds; that the names of the bondholders are numerous, and cannot make them defendants; that the amount of the bonded indebtedness cannot be stated; that A. W. Newton had authority from the trustees to dispose of the lands, and is offering the same for sale; that the lands in Exhibit A are worth $50,000 and upwards, and have timber of value; that by virtue of the railroad grant, and authority thereunder, timber has been cut on said lands; that said lands are unoccupied, and are not used for right of way or depot buildings or grounds,—

"But still are the property of the State of Michigan, vested in it by the grant of 1850, and the acceptance of the same by the Legislature of the State of Michigan as aforesaid."

That the timber being cut is valuable, and the timber uncut is of great value; that the only claim of said defendant to said land is under the railroad land grant of February 14, 1857, and the certification of such lands by the officers of the Interior Department of the United States; and that inasmuch as the grant of said lands described as aforesaid in Exhibit A, and the identification of the same, were made prior to the grant to the State of Michigan for the construction of a railroad from Pere Marquette to Flint, Mich., and thence to Port Huron, Mich., and the title of the State of Michigan was full and complete prior to the conferring, or any attempt to confer, the said lands upon the said Flint & Pere Marquette Railway Company or its successor, and its several trustees took and hold neither a legal nor equitable claim to said lands, and the claim of the defendants rests upon certain acts of the officials of the general government, which constitute a cloud upon the title of the State of Michigan, therefore the bill alleges that neither the defendant company, nor the predecessor company, nor the trustees, had any title to the land. Is advised that parcels of land have been disposed of by contract or deed to persons whose names and residences are not known, and whom he asks—

"Leave to make parties to these proceedings when he shall be able to discover that there are such parties who have claims to any part or portion of said lands."

, States that the agent of the said Flint & Pere Marquette Railroad Company, and so, in effect, the company, had notice at the time these lands were listed that the—

"Same were shown by the minutes of the survey made by the Surveyor General of the United States for the State of Michigan to be swamp lands of that kind and character granted to the State of Michigan by the act of 1850, and, notwithstanding such knowledge, he caused the same to be listed as railroad lands, and kept the knowledge of the true character of the lands from the State Board of Control of Railroads for the State of Michigan."

States that application has been made to the Federal Land Department to have the claim of the railroad company canceled, and that the Federal Department declined to take any action therein.

Charges that the action taken by the agents of the defendant and the predecessor company—

"Are fraudulent, as against the State of Michigan, and operated to impair its title to said lands, and prevent the State from disposing of the same to actual settlers."

Alleges that the State has no full and complete remedy except in a court of equity, and that, in order to protect the title of the State and free the same 'from cloud, and prevent sales of said land, and further sales of timber thereon, and irreparable injury to the State, it becomes and is necessary for the court of equity to interfere; and asks that the defendants answer the bill without oath, and that the defendants be enjoined from the sale of any of the lands described in said Exhibit A, or from selling any timber upon said lands, and that the title of the State may be confirmed, and that the defendants be required to account for all timber cut under their authority.

### ANSWER.

1. Defendants' answer sets out, first, that the defendant corporation does not and never has claimed ownership in any of the lands other than its station grounds and depot buildings, and has no power or authority over the same, except to call the trustees to an account for the proceeds. Denies that the State of Michigan has any power or control over the lands or any of them.

2. Defendant Newton states that he has no power or control over the land, except as conferred by the trustees.

3. Defendants Prescott and Crapo state that they, as trustees, are the owners of the land, except so far as they had been previously disposed of, and except one parcel, which was never claimed as within the railroad grant; that their title is derived under the act of Congress of June 3, 1856, and the act of the Legislature of the

State of Michigan of February 14, 1857, and sundry subsequent conveyances.

4. The trustees say they admit the act of September 28, 1850 and that it became the duty of the Secretary of the Interior to identify the lands, but they deny that the effect of the grant was, as stated in the information, to vest title in the State prior to identification, and deny that the fee-simple title passed prior to patent, and deny the claim of the State.

5. Admits that methods for identifying particular descriptions to pass to the State under the swamp-land act were proposed, and that the State passed the act of June 28, 1851. Denies that if correspondence did take place between the Federal and State officers, as stated in the bill, it "could have effect to increase the rights of the State of Michigan beyond the terms of the act of Congress granting said lands."

6. The trustees answer further concerning the survey of public lands, and the instructions and regulations, and refer to them as public documents; but deny that any arrangement between the Land Commissioner of the United States and the State could perfect in the State of Michigan complete title to the lands shown by the Surveyor General's minutes to be swamp and overflowed prior to confirmation by the issue of patent.

7. The trustees further say that it was a matter of common knowledge that many of the surveys in Michigan were false and fraudulent, and the field-notes unreliable, the surveys never, in fact, having been made in accordance with the said field-notes, and the maps drawn from said field-notes were purely fictitious; that the false and fraudulent surveys were rejected, and new surveys were made; that since that time it has always been the practice to regard the field-notes of said resurvey as the proper and only field-notes having recognized authority; and that the same were adopted and accepted, both by the State of Michigan and the United States, to be in lieu of and as abrogating the previous false and fraudulent surveys, field-notes, maps, and plats.

Defendants deny that lands which were not in fact swamp and overflowed lands, and which were shown by said false and fraudulent surveys to be swamp and overflowed lands, passed to the State.

Aver that the resurveys made pursuant to the authority of Congress, and the field-notes of the resurveys, were the notes of the surveys to which the arrangement for identifying the lands referred, and that such have ever since been so regarded, both by the State and Federal government.

Defendants deny that it was competent for any of the officers of the Federal or State government to transfer the title from the United States to the State, unless the lands were in fact of the

character described in said act; and they deny that the act itself operated to convey any present right to any of the lands, except such as were of the character specified in said act of Congress.

8. States that, being deceived by the false and fraudulent surveys, the Secretary of the Interior did approve, and patents were issued to the State of Michigan for, very many thousands of acres of land which were not in fact swamp and overflowed lands, unfit for cultivation. Defendants aver that more than 50 per cent. of said lands were not of the character contemplated by said act, and which the State has received without right.

9. As to the third clause of the information, defendants say it is vague, uncertain, and insufficient in its averments.

Deny that the State of Michigan, for a period of 30 years since said grant, has claimed, or assumed to claim, any of the lands in Schedule A described, with the exception of the fractional lot hereinbefore disclaimed; and deny that the lands in said Schedule A annexed to said information are in fact swamp and overflowed lands, and of the character specified in said grant.

10. The trustees admit that June 3, 1856, Congress passed the act granting lands to Michigan to aid in the construction of railroads, and that February 14, 1857, the Legislature of Michigan conferred upon the Flint & Pere Marquette Railway Company the lands to aid in the construction of the road.

States that thereafter the Flint & Pere Marquette Railway Company went into the hands of a receiver; that another corporation was organized under the General Laws of Michigan, known as the Flint & Pere Marquette Railroad Company. Denies that the latter took title in the lands formerly held by the former corporation. Denies that it still holds, or claims to hold, the same. Admits that an agent was to be appointed by the Governor of the State to select the indemnity lands. Admits that the lands in Exhibit A, excepting the lot disclaimed, have been certified by the Secretary of the Interior and the Commissioner of the General Land-Office to the State as lands identified as being within the act of June 3, 1856, for the benefit of the Flint & Pere Marquette Railway Company.

States that no patents have been issued under the grant of June 3, 1856, but the title passed by statute; that the identification was made complete by the certification of the Federal Land-Office.

11. States that the Flint & Pere Marquette Railroad Company is a corporation, and that the Flint & Pere Marquette Railway Company, before the defendant railroad company had existence, had conveyed its lands to trustees. Admits the value of the lands. Admits that there is valuable timber upon the same and that some of the timber has been cut off.

States that the greater portion of the lands in Exhibit A have been offered for sale for more than 20 years, and that less than

one-fifth of the acreage described in said exhibit remains unsold; that many of the parcels have been sold and occupied for more than 15 years, and the title of the purchasers has never been questioned until the filing of this information.

Denies that the lands are all unoccupied.

Denies that the State had title to any of these lands under the swamp-land act, but states its effect to be that the State took title under the railroad grant, and that the title passed to the railway company.

12. Defendants claim that the certification of said lands under the railroad grant was of itself an adjudication that the lands were not of the character described in the swamp-land act of 1850, and was "a conclusive adjudication that said lands were included within said railroad grant of 1856."

13. States that there is no valuable timber upon the lands unsold. States that the lands are valuable mainly for agricultural purposes, and that the trustees desire to sell them.

14. Denies that the agent of the former corporation, the Flint & Pere Marquette Railway Company, and so the company, at any time had knowledge that the same were shown to be swamp land, and that he kept that knowledge from the Board of Control of Railroads.

Denies that a court of equity is a proper tribunal to try this question.

15. States that the letter "S" was not put by the Surveyor General upon the maps so made from the field-notes to indicate that they were swamp lands, but states that it was put there without authority, and has no legal force or effect as indicating the character of the land upon which it was placed.

16. That it was the policy of the Federal and State governments to promote settlement and development of the country; that, to the end that no conflict might arise, the State passed the act of February 14, 1853, to confirm titles to purchasers, and to the same end Congress passed the acts of March 2, 1855, and March 3, 1857; and that no such legislation ever took the lands away from the State or from the Federal government, and that the question of adjusting these several questions belongs to and should be settled between themselves.

17. Avers that the claim now put forward by and in behalf of the State was never authorized by the Legislature.

18. Avers that, if the State became the owner as specified in the bill, so much time has elapsed that the State is prohibited by law, by the statute of limitations, from bringing any suit for the recovery of the lands, and claims the benefit of the statute of limitations to quiet title.

19. States provisions of law for collection of taxes upon these lands as railroad lands.

20. States that these lands in 1859 and 1860 were certified to the State of Michigan under the railroad grant; so the State had notice that these were railroad lands.

21. The State of Michigan employed a trespass agent to look after the railroad lands, and collect sums of money for trespass thereon.

22. Defendants claim that the State was estopped because application was made in 1870 to the Commissioner of the State Land-Office to know if any of these lands were claimed, and no such were then claimed.

23. Refers to the pamphlet, "Michigan and its Resources" in which these lands were advertised to the world as lands which the railroad company owned and could sell and give good title.

24. Submits that all matters in controversy could be determined at law, and claims the benefit of a demurrer.

---

| 89 | 503 |
|---|---|
| 104 | 33 |

| 89 | 503 |
|---|---|
| 111 | 556 |

| 89 | 503 |
|---|---|
| 148 | 1542 |

| 89 | 503 |
|---|---|
| 153 | 634 |
| 153 | 1635 |
| 153 | 1637 |