## Gilbert Dale v. James M. Turner and another.

*Swamp lands: Statutes construed: Purchaser from the United States: Intervening rights.* Under the act of congress of September 28, 1850, granting to the state of Michigan certain lands known as "swamp lands," and the subsequent acts of March 2, 1855, and March 3, 1857, and the statutes of Michigan of June 28, 1851, of February 14, 1853, and March 11, 1861, it is held that the rights of one who had purchased of the United States authorities in 1852, and gone into possession of a parcel of land embraced in the scheme of the original act of 1850, were paramount to those of the state under said grant, or of its assigns.

DALE *v.* TURNER.

*Legislation construed.* The intent is plain from this legislation, both on the part of the United States and of the state, to make this donation to the state, as contemplated in the original grant, subject to all intervening rights of parties who had, before the complete vesting of the title in the state, purchased from the United States.

*Swamp land acts: Donation to state: Intervening rights: Sales by United States.* Whether or not the original act was sufficient of itself to work an immediate transfer of title to the class of lands to which it applied, it was clearly within the power of the contracting parties, the state and the United States, to agree, in the absence of any conflicting right, that sales made by the latter subsequent to such act should be respected by the state and be left to be completed by the United States by conveyance, and that the state should resort to the United States for equivalents; and their action clearly indicates that they did make such agreement.

*Bills to quiet title.* Under the statute (*Comp. L. 1871*, § *5072*) providing for filing bills to quiet title to lands, a complainant, whose grantors had purchased of the United States in 1852 a parcel of said swamp land, and who is in actual possession thereof, may come into equity for protection against the claims of a defendant under a subsequent patent from the state, who has never been in possession.

*Estoppel in pais: Equity pleading: Answer.* A defense based upon an estoppel *in pais* cannot be sustained unless it be pleaded; and an averment, in an answer to a bill to quiet title and to restrain an ejectment, that one alleged to be complainant's solicitor urged the bringing of the ejectment, and represented that complainant was aware he had no title and was desirous of having an ejectment prosecuted to judgment to enable him to have recourse against his warrantor, but which is not pleaded as matter of estoppel, is insufficient, if established, to make out a valid defense of estoppel.

*Heard June 20.    Decided October 4.*

Appeal in Chancery from Eaton Circuit.

*I. H. Corbin, John M. Corbin, E. A. Foote* and *P. T. Van Zile,* for complainant, to the point that complainant's title was such only as the locator, Britton, acquired by his entry and location, and this was an equitable title, cited: *4 Wall., 210; 11 Wheat., 200; 3 How., 441;* as to complainant's right to come into equity for relief: *Comp. L., 1871*, § *5072; 1 Doug., 546; 9 Mich., 381; 16 Mich., 135; 13 Peters, 436; 11 Wheat., 380.*

This case is not within the ruling of *Grant v. Smith, 26 Mich., 204,* or *Busch v. Donohue, 31 Mich., 481;* or *R. R. Co. v. Smith, 9 Wall., 95;* the swamp land grant of 1850 is to be construed as only an agreement

to convey: *5 Wend., 26;* and the state, by the action of its legislature in 1853, waived its claims as against intervening purchasers from the United States; a grant by congress should have operation according to its intent: *20 Mich., 304;* as to construction of government grants: *11 Peters, 589; 15 Ib., 215; 16 Ib., 411; 1 Black, 377; 24 Ark., 440; 17 How., 558;* that this was not a grant *in presenti: 63 Ill., 359; 66 Ib., 450; 67 Ib., 281.*

The equitable title of the locator, confirmed by congress, is the highest evidence of title: *2 How., 319.*

A defendant can only defend on the grounds set up in his answer: *2 Mich., 144, 161; Walk. Ch., 267;* facts proved but not put in issue by the pleadings cannot be regarded at the hearing: *2 Mich., 381; 6 Ib., 133; 8 Ib., 395; 9 Ib., 213; 10 Ib., 453; 11 Ib., 284, 529; 16 Ib., 223;* and therefore the defense of estoppel cannot avail in this case.

*Crane & Montgomery,* for defendants, relied mainly upon *Busch v. Donohue, 31 Mich., 481.* They argued that no state court could make a decree in a collateral proceeding declaring that the government exceeded its powers in issuing a patent, or invalidating or setting aside such patent, or holding the government equitably estopped by a transaction of one of its agents from patenting its lands: *Bruckner v. Lawrence, 1 Doug., 37; Bruner v. Manlove, 1 Scam., 161; Jackson v. Ingraham, 4 Johns., 181; Mansey v. Drake, 10 Johns., 23; 2 Wash. R. P., 524, § 24; Jackson v. Hart, 12 Johns., 81; Boggs v. Mercer Mining Co., 14 Cal., 361; Field v. Seaburg, 19 How., 333;* that the grant of 1850 was a grant *in presenti* and the title *then* passed to the state, so that the lands were no longer subject to private entry: *31 Mich., 481; R. R. Co. v. Fremont Co., 9 Wall., 89; 2 Wash. R. P., 525, 526, §§ 26–30; R. R. Co. v. Smith, 9 Wall., 95; Johnson v. Ballou, 28*

*Mich.*, *383; 24 Ark.*, *437;* that if the patent were necessary to transfer the title, it took effect by the doctrine of relation from the time when the state became entitled: *13 Wall.*, *100;* that if it were necessary to make the grant definite and certain in its application to particular parcels, this was accomplished by the designation on the maps of survey, and the subsequent acceptance by the legislature; and the act of 1850 was as effectual to transfer the title as a patent: *Enfield v. Perruit, 8 N. H., 512; Enfield v. Day, 11 N. H., 520.*

GRAVES, J :

This cause comes before the court by appeal on complainant's part from a decree dismissing his bill on pleadings and proofs.

The parties holding hostile claims to two forty-acre parcels of swamp land, and complainant being in possession, the defendants brought ejectment, and thereupon complainant filed the present bill to enjoin the law proceedings and to subject the question of right underlying the controversy to decision in equity.

The complainant claims through several mesne grants from one Britton, who in 1852 made an entry at the United States land office at Ionia under a military bounty warrant, and received from the office a certificate of purchase in the usual way. And the defendants claim as purchasers from the state under its patent regularly issued to them in 1873.

The facts connected with the final question do not appear to be disputed, and of course the acts of congress and of the legislature are recognized by the court.

On the 28th of September, 1850, congress passed the act commonly known as the "swamp land act," and thereby granted for the purposes specified the swamp and overflowed lands, "made unfit thereby for cultivation." The act required the secretary of the interior, as soon as practi-

cable, to make out an accurate list of the plats of such lands and transmit the same to the governor, and on request of that officer to cause a patent to be issued to the state therefor; and it declared that on that patent the fee simple to said lands should vest in the state subject to the disposal of the legislature. Prior to the transmission of any lists to the governor by the secretary, and nine months after the passage of the act of congress, namely, on the 28th of June 1851, the legislature passed the act entitled, " An act to provide for the sale and reclaiming of swamp lands granted to the state, and for the disposition of the proceeds," and the first section declared that the legislature adopted "the notes of the surveys on file in the surveyor general's office, as the basis upon which they will receive the swamp lands granted," etc.

The third section declared that "the commissioner of the state land office shall have the control and supervision of said lands, and of the sale thereof, and shall, as soon as the title vests in the state, cause the same to be sold," etc.; and the sixth section declared that "said lands shall only be sold in the same legal subdivisions in which they shall be received by the state."—*L. 1851, p. 322.*

The lands in question belonged to the class of lands described in the act of congress, and were designated as swamp or overflowed lands on the official plats of the United States survey.

Subsequent to this act of the legislature, but prior to any further proceedings by authorities at Washington, and on the 17th of March, 1852, Britton entered the land at the United States land office at Ionia, by means of a military land warrant, and the officers there regularly recognized him as purchaser, and gave him a certificate of purchase in due form and according to the practice of the office.

Possession was at once taken by Britton as purchaser, and it has remained since in those holding his right, of whom complainant is the last. Sometime after his purchase, but at what precise time does not appear, except that it was

prior to sale by the state to defendants, the land warrant and an application for a patent to Britton were filed in the general land office at Washington, and have since remained there.

We have the most conclusive evidence from departmental and judicial records that between the passage of the swamp land act and the formal identification of the parcels appropriated and the practical transfer of their administration to state authority, the cases in this and other states of purchase of the United States, or of entry under their laws by private parties, were very numerous, and we also know that the existence of this state of things was matter of common notoriety at the time; moreover, during the period in question, there was grave difference of opinion as to whether the act of congress of its own force worked an instantaneous transfer, or merely devoted the lands to eventual transfer, and contemplated that they should be catalogued by the secretary of the interior, and perhaps patented in order to consummate conveyance. Many able men were of the latter opinion, and our own legislature appears to have taken this view in framing the act of June 28, 1851, and to have continued it for some time afterwards. The phraseology of the act of 1851, and of some other acts can hardly be accounted for on any other theory.

Seeing that the purpose of congress was to make a donation, and not a conveyance for consideration, and believing that the act did not of its own force immediately transfer the lands in absolute property to the state, and naturally wishing to act in the same spirit of liberality which had actuated the general government, the legislature were of opinion that measures should be taken to protect the rights of intervening purchasers from the United States, and enable the state and the United States to settle in an amicable, fair and practical way as between themselves in all cases where the rights of such purchasers might be involved. The very nature of the subject, and all the circumstances, were adapted to incline the legislature to act on broad views of

right and policy, and to abstain from all extreme pretensions and all attempts to gain technical advantage. In its origin and development the matter was not one of negotiation and diplomacy, nor one stimulated or directed by national or personal greed. The occasion was not one of higgling between eager and exacting adversaries. It was an affair between governments of the same system, intimately connected by the ties of interest and of friendship. The lands were to be a gift. Moreover, the purchasers in question were likely to be inhabitants of the state, and their interests might naturally be thought to merit on that account a particular solicitude by the legislature. As we have seen, Britton, the complainant's predecessor in right, was one of these purchasers. These considerations naturally conduct us to the act of the legislature of February 14, 1853. It was entitled, "An act to authorize the state treasurer to receive from the general government certain moneys arising from the sale of swamp lands, and to authorize the commissioner of the state land office to take an assignment of all warrants received for any of the swamp lands sold in this state since the act of congress approved September twenty-eighth, eighteen hundred and fifty."

The act expressly authorized the state treasurer to receive from the general government any moneys which had then been received, or might thereafter be received for any of the swamp lands "donated" to the state, and also expressly authorized the commissioner of the state land office to take assignments of all bounty land warrants *received* for any swamp lands sold in the state subsequent to the passage of the act of congress, and to release the interest of the state in any lands sold or entered with said warrants to purchasers or their assigns. The act also made provision for protecting the rights of those who were actual pre-emptioners under federal laws when the swamp land act was passed. —*L. 1853, p. 116.*

Some months later, and on the 27th of October, 1853, the commissioner of the general land office at Washington

prepared lists of the Michigan swamp lands, and no doubt he conformed in making them to the "basis" suggested in the act of this state of June 28, 1851, and followed the notes of the surveys on file in the surveyor general's office. These lists, one of which contained the lands in question, the commissioner submitted to the secretary of the interior, the officer designated by the swamp land act to make and transmit the lists, and he at once certified them as follows: "The lands embraced in the following lists are hereby approved to the state of Michigan under the act of congress approved 28th September, 1850, subject to any valid legal claim that may exist thereto."

This proceeding was nothing more than the execution of a departmental schedule, upon the "basis" before mentioned, to supplement the original act and identify according to the notes in the surveyor general's office, the parcels to be considered as swamp lands within the terms of the act of donation. It was not intended to operate and was not of force to operate so as to extinguish or defeat rights which individuals had previously acquired by purchase of specific parcels of the United States and payment of cash or warrants therefor, and which rights, moreover, the state by legislative act had solemnly announced in effect it would not disturb.

Whether particular parcels after the 28th of September, 1850, had not been so dealt with between third parties and federal land officers as to make it just to except such parcels or expressly stipulate for the protection of such third parties, was not a matter within the scope of the proceeding, or one the secretary had power to settle. In merely applying the general act to the particular parcels which its general terms called for, no such matters were touched at all. They were necessarily left to other regulations. The secretary, however, took the precaution to include in his certificate of approval of the descriptions a declaration that it was made and to be received "subject to any valid legal claim that may exist thereto."

The act of 1853 continuing in force as the expression of the legislature of Michigan that the rights of intermediate purchasers from the United States should be respected, and that the state would have recourse to the United States for any indemnity which might be proper, and many controversies arising in this and other states on account of such purchases, and the land department at Washington being greatly embarrassed thereby, the attention of congress was strongly attracted to the subject, and with a view to settle upon some practical basis for the fair adjustment of all difficulties, the act of March 2, 1855, was passed.—*10 U. S. Stat. at Large, 634.*

It was entitled "An act for the relief of purchasers and locators of swamp and overflowed lands." It contained but two sections, and the first enacted that as soon as practicable the president should cause patents to be issued to the purchasers or locators who had entered public lands, claimed as swamp lands, either with cash or with land warrants or scrip, prior to the issue of patents to the states as provided by the second section of the swamp land act, any decision of the secretary of the interior or other officer of the government to the contrary notwithstanding; except that in cases of sales by the states before entry under the laws of the United States no patent should be issued until the state should release; but yet if the state omitted for the space of ninety days to forward lists of the lands so sold, that then patents should issue as before ordered without delay.

The second section provided for indemnity to the state by ordering that the purchase price in case of cash sales by the United States, should be paid over to the state, and in case of sales for warrants or scrip that the state should have other lands to be selected by it from any of the public lands subject to entry and for which it should receive patents.

However this enactment may have agreed or disagreed with legislation elsewhere, it imported both in spirit and sub-

stance that congress acceded to the course indicated and held out by our act of 1853.

It embraced the same idea that the purchases from the United States should stand and be carried out by the latter, and that the state should be indemnified.   Subsequently, and on the 26th of February, 1857, a patent to the state was issued out of the department at Washington for the lands covered by the general terms of the act of 1850, and it embraced the descriptions of the lands in question.   In drawing up this patent there was no attempt to discriminate and exclude the parcels within the purview of the acts of 1853 and 1855.

The patent simply assumed to follow the selections which had been previously made as answerable to the general call of the act of 1850.   This is indicated by several incidents and is made very apparent by the recital in the patent. There was neither any design nor any power to include in the act of patenting a departure from the legislative regulations concerning exceptional cases.

They were to remain subject to those specific provisions and stipulations which congress and the legislature had decided to be appropriate.   It is not necessary to resort to general reasoning to show this.   It appears sufficiently from the state of things and later proceedings.   Within a week after the patent issued, namely, on the 3d of March, 1857, congress very explicitly manifested its sense on the subject. It passed an act to confirm to the several states the swamp and overflowed lands selected under the act of 1850, and under an act of the previous year, and enacted that the selection of swamp and overflowed lands previously made and reported to the general land office, and remaining vacant and unappropriated, and not interfered with by actual settlement under any existing law of the United States, was thereby confirmed, and should be approved and patented as soon as practicable conformably to the original act.   But it was at the same time expressly declared that nothing in the

act should interfere with the provisions of the act of 1855, and that such provisions should continue in force and extend to all entries and locations of lands claimed as swamp lands made since its passage.—*11 U. S. Stat. at Large, 251.* Nothing can be clearer than this evidence of the will of congress that such purchases as that of Britton should still stand guarded and be considered as protected by the act of 1855, and be wholly unprejudiced by any decision of United States officers in the giving out of a patent to the state or otherwise. On the other hand, the state legislature not only retained the act of 1853, but on the 11th of March, 1861, proceeded to enact that the commissioner of the state land office should cause lands sufficient to supply the existing deficiency in the quantity accruing to the state by virtue of the act of congress of May 20, 1826, the ordinance of admission and any other land grant since made to the state by act of congress, to be selected and located in parcels in conformity with the provisions of the several acts making the same.—*L. 1861, p. 167.* This act supplemented that of 1853, and supplied an express and specific direction for working out equivalents in land, as contemplated by the act of congress of 1855.

The act of 1853, in providing that swamp lands purchased with warrants should be released, and that the commissioner of the state land office should take assignments of the warrants, may have contemplated that other lands might be selected; but if it did so, it was quite proper to make the matter distinct and certain.

It is considered clear that notwithstanding the emanation of the patent, all transactions like that in question were meant to be left, and were left, to the control of the exceptional regulations marked out by the acts of 1853 and 1855. After the patent to the state, and on the 7th of October, 1859, the commissioner of the general land office at Washington notified the governor of the issue to Britton before the patent, of the certificate of purchase upon the warrant, and asked the governor to execute a release to the United

States, so that the land might be patented pursuant to the purchase. This, however, was never done, and finally, and on the 17th of February, 1873, the land was sold and patented by the state authorities to the defendants for one hundred dollars.

This somewhat tedious explanation not only shows the complexion of the controversy between the parties, but also leads at once to an opinion upon the question of right.

There is no occasion to assail the position that the swamp land act was sufficient to work an immediate transfer of the class of lands to which it was applicable. Because, if it was so, it was still within the power of the state and the United States, the parties to the grant, to agree, in the absence of any conflicting right, that sales made by the United States subsequent to the swamp land act should be respected by the state and be left to be completed by the United States by conveyance, and that the state should resort to the United States for equivalents, and it is upon this very ground the complainant's right may rest.

In the act of 1853 the legislature distinctly recognized such sales as that which had been made to Britton as transactions to be respected and guarded and to be left for the United States to consummate by conveyance, and at the same time and in the same connection held out that the state would have recourse to the United States for indemnity and in substance made overtures for it; and congress, by the act of 1855, in effect assented to the scheme suggested by the act of 1853, and made provision for patenting to purchasers and for equivalents to the state; and if there was any uncertainty before in regard to the receipt and selection of other lands by the state in place of parcels entered on warrants, it was entirely removed by the state act of 1861.

These enactments then constituted an arrangement in the nature of a compact or special bargain that such sales as that to Britton should not be invalidated by the operation of the swamp land act, but should be left to be carried

out by the United States as though such act were not applicable, and that the state should look to the United States for indemnity for parcels of swamp lands thus disposed of.

Such being the case, the lands in question were lawfully taken out of the category of swamp lands controllable by the legislature, and were not vendible by state authority in 1873, when defendants purchased and received their patent.

Under these circumstances, may complainant come into equity to assert his right and obtain protection against the hostile claim of the defendants?

If this inquiry depended on the scope of the routine jurisdiction of the court, the determination to be made upon it might require special consideration.

But the statute (§ *5072, C. L.*) appears to exclude all questions and to require an affirmative answer.

The case establishes these propositions:

*First,* That complainant holds a complete equitable title, and which antedates the origin of any claim by defendants.

*Second,* That actual possession under such title is in him, and was so when defendant's claim arose, and has so remained.

*Third,* That prior to this suit, and at its commencement, the defendants set up a claim to the land in opposition to the title claimed by complainant. Complainant's cause would therefore seem to be strictly within the statute. See *Stark v. Starrs, 6 Wall., 402; Meader v. Norton, 11 Wall., 442.*

It was objected on the argument that even if complainant's right should be found complete, still there were special circumstances which were sufficient to estop him from maintaining it in this court. This is sufficiently answered by saying that no such defense is pleaded. It is true that in answering the statement in the bill setting up the institution of the ejectment suit the defendants state certain facts in explanation of the commencement of that suit and to the effect that a gentleman alleged to be complainant's solicitor urged the bringing of it, and represented that complainant

was aware he had no title and was desirous that an eject-ment should ·be prosecuted to judgment to enable him to have recourse against his warrantor.

These facts were not pleaded as a ground for claiming that complainant was estopped thereby from prosecuting his bill, and they were not sufficient if they had been. Indeed, the answer made no reference to such a position, and the objection is not now rested upon these matters alone, but upon these and other distinct and important matters given in evidence, but without any basis for them in the answer. But if this defense had been advanced in pleading, the court is far from satisfied it could have prevailed. The point, however, is not in the case, and is consequently not decided.

The decree below must be reversed, with costs of both courts, and one entered perpetually enjoining the ejectment suit and requiring the defendants to release to complainant all claim to the lands depending on the state patent, this decree standing in the meantime in place of such release.

The other Justices concurred.