### MICHIGAN LAND & LUMBER CO., Limited, v. RUST.

(Circuit Court of Appeals, Sixth Circuit. May 7, 1895.)

No. 178.

**1. PUBLIC LANDS—SWAMP-LAND ACT—VESTING OF TITLE.**

The surveys of public lands in the state of Michigan, as originally made, were, in many localities, fraudulent and erroneous, both in respect to lines and corners and to the character of the land. Prior to the passage of the Swamp-Land Act Sept. 28, 1850, these frauds and errors had been discovered, and the general government, at the request of the state of Michigan, had undertaken a resurvey of the lands. After the passage of the swamp-land act, the legislature of Michigan resolved to adopt the notes of the surveys, on file in the office of the surveyor general, as the basis of the lists of lands passing to the state under the act. In 1853 a list of lands, including certain lands in controversy in this action, which were indicated on the list as being included in a fraudulent survey, was approved by the secretary of the interior, and transmitted to the governor of Michigan, who thereupon requested a patent for such lands. No patent, however, was issued until 1857, when, the resurvey having been completed, and the lands in question ascertained not to be swamp lands, a patent was issued for sundry parcels of land, not including the lands in question. In 1858 a supplemental list of lands, intended to supersede the former lists, and covering the township in which the lands in controversy were situated, but not including such lands, was transmitted by the surveyor general to the commissioner of the land office, and such list was approved by the secretary of the interior in 1866, and transmitted to the governor of Michigan, upon whose request a patent was issued to the state, not including the lands in controversy. In 1855, pursuant to information from the general land office of the progress of resurveys and corrections of the erroneous lists and to the request of the general government, the state of Michigan suspended action upon the lists, first furnished, based on the erroneous surveys. The state was also fully advised of the action of the general government in regard to such corrections, and of the substitution of new plats, based on the new surveys in the government land offices. The lands in controversy were sold at auction at the United States land office, without objection by the state, but the state afterwards issued patents therefor to the plaintiff's predecessor in title. *Held* that, although the swamp-land act operated to convey title to the lands affected by it to the state in praesenti, such title did not attach to the lands included in the first list approved by the secretary of the interior, immediately upon such approval and before the issue of a patent, so as to prevent the subsequent correction of such lists to cure frauds or errors, and remove from the operation of the grant lands not properly within it.

**2. SAME—MISTAKE.**

*Held*, further, that when a selection or designation of lands granted by congress has been made, under a mistake of fact induced by a false or fraudulent survey, and no rights of third parties have intervened, the secretary of the interior has power, at any time before issuing a patent, to recall and correct such designation.

3. SAME—ACT MARCH 3, 1857.

    *Held*, further, that the act of March 3, 1857 (11 Stat. 251), providing that the selections of swamp lands theretofore made should be approved, and patented to the several states, was not intended to apply to and confirm old lists founded on the erroneous surveys which had been superseded by new lists, nor to override the general power of the secretary of the interior to correct frauds and mistakes.

4. EVIDENCE—JUDGMENT.

    Upon the trial of an action of ejectment by a plaintiff, claiming under the patent from the state, against a defendant, claiming under the patent from the United States, the plaintiff offered in evidence the record of a suit brought by the United States on the bond of one of the surveyors who made the original fraudulent survey, in which suit there was a verdict for the defendant. *Held*, that such evidence was properly rejected.

    In Error to the Circuit Court of the United States for the Eastern District of Michigan.

    This was an action of ejectment by the Michigan Land & Lumber Company, Limited, against Charles A. Rust. Judgment was rendered in the circuit court for the defendant. Plaintiff brings error. Affirmed.

    This is an action in ejectment brought in the court below by the plaintiff in error to recover 260 acres of land in township 18 N., of range 3 W., in the county of Clare, state of Michigan. The declaration originally included other lands, but they were stricken out by amendment, and by a further amendment the plaintiff's claim was limited to an undivided half interest, which it claims in fee. The plea was the general issue. The case was tried by the court with a jury upon evidence adduced by the parties, and the jury, by direction of the court, rendered a verdict for the defendant. Judgment having been entered thereon, the plaintiff brings the case here for review upon exceptions taken upon the trial to the rulings admitting or rejecting evidence, and to the giving and refusal of instructions to the jury. The plaintiff founds its right to recover upon a title derived through Edward W. Sparrow, to whom patents of the land were issued by the state of Michigan, bearing date April 14, 1887. It is claimed that the state had acquired title to the lands under the act of congress of September 28, 1850, known as the "Swamp-Land Grant." The defendant claims title through mesne conveyances under patents issued by the United States for parts of the lands in question to William A. Rust, May 10, 1870, and for the other part to Addison P. Brewer, January 10, 1867, upon purchases of the said lands by the respective patentees.

    The questions involved render it necessary to take into view a brief history of the proceedings of the United States and of the state of Michigan taken for the survey and disposition of the public lands lying within the state,—proceedings some of which took place prior to the date of the grant, but which created conditions in which the grant was administered, and others of which are explanatory of the intent and purposes of those who participated in its adjustment. So much of this history as is deemed essential in the opinion of the court will now be referred to.

    Prior to the enactment of the swamp-land grant (Act Sept. 28, 1850), the larger portion, but not all, of the public lands in Michigan had been surveyed. The work had been done by deputy surveyors under contracts with the United States. Unfortunately such contracts were in many instances defectively and fraudulently executed, and the surveys were so imperfect that great embarrassment and difficulty were experienced in making locations and settling the country, not only from the lack of the marks and indications upon the land required by the law of the survey, but also from the falsity of the character given to the quality of the land, which was likewise required to be stated in the survey. Such imperfections and difficulties arising from defective surveys existed in other states, but they seem to have been extraordinary in Michigan, and the mischief was widely extended through the state. Soon after the admission of the state into the Union the legislature adopted a joint resolution, which was transmitted by the governor to the president of the United States by a communication dated February 3, 1842, re-

citing that large districts of land within the state had been returned by the deputy surveyors as surveyed where no surveys whatever had been made, or where the surveys had been so imperfectly done as to be utterly valueless; and that the lands so represented as surveyed had been offered for sale to the very great injury of the state and the citizens thereof, and requesting the president to cause a resurvey to be made in certain townships, 81 in number, represented to have been surveyed, but which had not been surveyed, or so imperfectly surveyed that the work was valueless. Upon the recommendation of the commissioner of the general land office, the governor's communication and the resolution of the legislature were referred to the surveyor general for a report of the facts, to the end that proper action might be taken. A report was made by that officer, stating that information of a similar character about the surveys in Michigan had come to him, showing how such frauds as were complained of might exist without appearing from anything in his office, and recommending the sending of an experienced surveyor into the field to test enough of the surveys to determine the truth in regard to them. Upon this report the commissioner of the general land office issued instructions to the surveyor general to pursue the course which the latter had recommended, and, if the surveys proved defective in field work, that new surveys in all such cases should be made. The governor of the state was notified of what was being done in response to the request of the legislature. On the 11th day of April, 1842, the surveyor general commissioned William A. Burt to make the proposed examination. This commission was executed by Mr. Burt, and upon his report the surveyor general communicated the results thereof to the commissioner of the general land office, stating that the report furnished abundant proof that the surveys examined by Mr. Burt were grossly defective and fraudulent, and added that there was great probability that the other surveys made under the same contracts were as defective as those which had been examined. The substance of this report was communicated to Senator Porter, of Michigan, by the commissioner of the general land office, with a statement that it was designed to issue instructions for the necessary resurveys. In a further communication from the surveyor general to the commissioner of the general land office in April, 1843, it was stated that by a report of Mr. Burt, whose examinations appear to have been continued, in the townships examined by him, a very small portion of any of the lines had been surveyed or marked, and that what was found to have been done was so erroneous and defective that little or none of it could be relied upon.

In September, 1844, Mr. Woodbridge, who was then a senator from Michigan, addressed the commissioner of the general land office, and, referring to the measures taken by him to obtain appropriations for resurveys in that state, said that the great and increasing evils suffered by the state, in consequence of the false surveys made therein, remained without correction; that they were of incalculable extent, and had produced a deep feeling of wrong throughout the state. In reply to that letter, after referring to the apportionment of an appropriation to be expended in correcting fraudulent surveys in certain parts of the state, the commissioner further said: "All the other cases of erroneous or defective surveys in Michigan will be examined, and instructions issue as speedily as they can be prepared." In pursuance of this general purpose, extensive examinations were made and resurveys were directed in various parts of the state. Resurveys were accordingly made, and instructions were issued by the commissioner of the general land office to the officers of the local land offices in the state, directing them to cancel the plats of the old surveys immediately on receipt of the plats of the new surveys, making proper reference on the old plats to the new ones, so that the old plats should not be used under any circumstances. Reports continued to come in showing the results of the examinations of the old surveys indicating their erroneous and defective character, and under the instructions of the land department resurveys were carried on in the localities which were shown to have been defectively surveyed. On the 10th day of July, 1849, the surveyor general, in a letter to the commissioner of the general land office, stated that from the examinations that had been made by Mr. Burt within the last three months it appeared that most of the field notes originally returned to the surveyor general's office by deputies Nicholson, Brookfield, and

Brink, as containing true descriptions of surveys made by them, were fictitious and fraudulent. The surveyor general thereupon recommended an entirely new survey of the districts just referred to, being those between townships 17 and 24 north, and bounded on the east by the principal meridian. This included town 18 N. of range 3 W., wherein are located the lands involved in the present suit, the original survey of which was made by Nicholson. It appears from the report of the commissioner of the general land office for 1849 that Mr. Burt was employed to fully examine the district which included the lands in question. The plats of 280 townships were furnished to Burt and to Risdon, another surveyor, to the latter of whom was assigned the examination of the lands not assigned to Burt. It was further stated in the commissioner's report that the returns of surveys in seven districts, embracing 91 townships, some of which were made by Nicholson, were grossly fraudulent, "the greater portion of the field notes thereof being wholly fictitious or descriptive of lines and corners that were never established." That the survey in the district of lands in question was contracted by Nicholson, and that examinations of his work made in every township showed that it "was bad throughout." The report also contained an estimate that an additional appropriation of $20,000 would be required for correcting erroneous and fraudulent surveys in Michigan. At the next session of congress the subject of an appropriation for resurveying and correcting erroneous surveys came under consideration, and it appears from an extract from the commissioner's report contained in executive document No. 2, senate, that the general condition of the surveys in that state was fully understood, as well as the measures being taken in the land department for correcting them by resurveys. In this report which the senate had before it was a map of the state which showed the condition of the surveys therein and indicated the towns defectively surveyed. Among those defectively surveyed was township 18 N., of range 3 W. From all this, and from other facts shown by the record of this case, and of which the court might take judicial notice, the general facts sufficiently appear that prior to September 28, 1850, the general government, in response to the request of the state and with its knowledge, had undertaken, and was then carrying on, extensive resurveys of the public lands in the state for the purpose of correcting those which were false, and supplying such portions of the original surveys as had never been made in the field at all; that as fast as the resurveys were made they were returned to the surveyor general's office, and were furnished to the local land offices in the state; and that, by general directions to those officers from the land department, the old surveys were canceled, and the new surveys were adopted as the guide for the disposition of the lands, and that the lands were disposed of on the basis of the new surveys. It is true, as appears, that there was some disregard of this practice at some of the local offices; but it also appears that, as soon as this disregard of instructions was brought to the attention of the land department, it was disapproved and immediately corrected.

This was the state of things when the swamp-land act was passed September 28, 1850. In order to ascertain what lands passed to the state under the provisions of this act, the commissioner of the general land office sent instructions to the surveyor general to make out lists of the land, and in these instructions the commissioner said to the surveyor general: "The only reliable data in your possession from which these lists can be made out are the field notes of the surveys on file in your office, and, if the authorities of the state are willing to adopt these as the basis of these lists, you will so regard them. If not, and these authorities furnish you satisfactory evidence that any lands are of the character embraced by the grant, you will so report them." A copy of these instructions was sent to the governor of the state. The legislature of Michigan, by Act No. 187, Laws 1851, p. 322, resolved to "adopt the notes of the surveys on file in the surveyor general's office as the basis upon which they will receive the swamp lands granted to the state by an act of congress, September 28, 1850." Lists of the swamp lands were made out by the surveyor general from the field notes of the surveys then on file in his office, which lists were furnished to the commissioner of the general land office. When these lists had been purged of the descriptions of lands sold by the United States prior to the date of the grant, they were presented to the secretary of the interior for approval. Among others, such a list, including the

descriptions in question, was approved by the secretary of the interior on the 27th day of October, 1853, and was transmitted by the commissioner of the general land office to the governor of Michigan, by letter dated January 13, 1854, saying that he transmitted "a certified copy of list number 1 of swamp and overflowed lands selected and inuring to the state in the district of land subject to sale at Ionia taken from the original files in this office, which on the 27th day of October, 1853, was approved by the secretary of the interior." This list included the lands in suit and a large quantity of other lands. In the margin of the descriptions contained in town 18 N., of range 3 W., was written the letter "F," which was explained in the accompanying certificate to mean that the survey of that township had been reported as fraudulent. Upon the reception of this list by the governor, and on January 31, 1854, he forwarded to the commissioner of the general land office a request for a patent of the lands contained therein, "conveying the fee-simple title in said lands to the said state of Michigan." This request was not complied with at the time nor until March 17, 1857, when, the surveys having been completed, the character of the land ascertained, and the lands which were fraudulently reported originally as swamp, but afterwards shown not to be so, expunged from the lists, a patent was issued which recited that it was in pursuance of the request of the governor of January 31, 1854. The resurvey of the township in question had in the meantime been made, and the patent did not contain any of the lands in that township. Up to and at the time when the above-mentioned approved list was transmitted by the land department to the governor of Michigan, the examinations of the old surveys and resurveys were going forward in the land district in which the lands in suit are located, and reports had been made to the land department by the surveyor general relative to the lands in the district, stating that "this entire section of country has until recently been considered low, level, and swampy, with pine, cedar, balsam, and hemlock ridges, cold, sterile, and unfit for cultivation. The furthest possible from this are the facts in reference to this region," and that, "in some instances in the original survey, lakes covering many hundred acres have been laid upon the maps where none existed, thus covering with water a large area of beautiful country which, but for these frauds, might long since have been opened for sale and settlement."

In the report of the commissioner of the general land office for 1853, which must have been made up at about the time when the certification of the list in question was pending in the office, it appeared on the authority of the surveyor general that, in the townships recently surveyed, "portions of the lines were run and found to be established; other lines were run, but seemed never to have been corrected; while other portions of the survey were found to be entirely fraudulent, no lines ever having been run." It was further stated in that report that "the examinations in the four districts embraced in my present estimate represent that in many of the townships no lines have ever been run. They also serve to show, as all examinations of defective surveys have ever done, that the field notes of the original surveys are no index to the true and real character and value of the country of which they purport to give a faithful description." "Instances are numerous where valuable agricultural and pine lands are found to exist in place of what has been reported as dense, and in some cases impassable, swamp or nearly worthless lands." The report estimated that an appropriation of $20,160 would be required to complete the work, and it appears that congress made the appropriation as requested. 10 Stat. 565.

On the 29th day of October, 1853, two days later than the date of the secretary's approval of the list of lands in the Ionia district, and while that list was still in the office, the surveyor general transmitted a supplemental list of swamp lands in that district to the general land office, stating that, in obedience to instructions from the commissioner, he had "indicated in the heading of this list that it is intended to abrogate and supersede all lists of swamp lands heretofore made of townships contained within it." To this the commissioner replied on November 7, 1853, saying: "Your letter of the 29th ultimo, transmitting supplemental list of swamp and overflowed lands in the Ionia district, Mich., intended to abrogate and supersede all lists of swamp lands heretofore made of townships contained within it, has been received. The original list will be altered so as to conform to said supplemental list."

Resurveys in this and other districts in the state went on. The commissioner of the general land office, in directing the making of such surveys by the surveyor general, instructed him that "the lines will have to be run, and the corners established as if originally, and all the irregular lines and corners must be most carefully and thoroughly obtained." As fast as they were completed, they were transmitted with the proper plats to the general land office, and to the local land offices, in the several districts in the state, where, by the instructions of the department, they superseded "the old and fraudulent surveys" which were to be treated as "abrogated"; and since that time the business at the general and local offices has been conducted upon the basis of the new surveys. The resurveys in Michigan were continued until as late as 1857, and congress made special appropriations therefor nearly every year from 1845 to 1856, inclusive.

On the 18th day of May, 1858, the surveyor general transmitted to the general land office a supplemental list of swamp lands which included town 18, range 3 W., and stated in the heading thereof that it was intended to supersede lists theretofore made of swamp lands within the townships contained in it. This list did not include the lands in question, and many other lands included in the original list were dropped, and many not included in the first were included in the later list. A list of lands designated in the record as list No. 10, Ionia, containing the lands in this township which were contained in the surveyor general's list last mentioned, was approved by the secretary of the interior, May 15, 1866, which was forwarded to the governor of Michigan on May 26th by letter from the commissioner saying: "You will please to acknowledge the receipt of said list, and transmit your request for the patent to issue, on the receipt of which, or as soon thereafter as practicable," patent will be issued conveying the fee simple in said lands to the state." The governor acknowledged the receipt of this list on May 31, 1866, by letter in which he says: "I have the honor to request that the patents for said lands may issue to the state of Michigan as soon as practicable conveying the fee-simple title thereof to the state." On June 21st following, patent was issued accordingly conveying among other lands those in town 18 N., of range 3 W., but not the lands in controversy here.

On February 24, 1855, the commissioner of the general land office, having received from the surveyor general a list of all resurveyed swamp lands, addressed a letter to the governor of Michigan stating that he had received such a list which he said "abrogates and supersedes all lists of swamp lands heretofore made of the townships contained within it." After giving a list of townships. he adds: "The original selections in the foregoing townships, made from the defective plats, were approved in lists numbers 1, 2, and 3, Ionia district, Mich., certified copies whereof were transmitted to your predecessor January 13, 16, and 18, 1854. In consequence of the alteration necessary, by reason of the list recently received, I have the honor to request a suspension of all action upon the lists heretofore furnished you, so far as these several townships are concerned, until the differences can be ascertained and adjusted." List No. 1 of January 13, 1854, above mentioned, is the one upon which the plaintiff founds its title. The governor took action in accordance with the request. In the report of the commissioner of the state land office for 1855, the above letter to the governor was mentioned, and the commissioner, saying that his office had been notified of the resurvey by the general government of considerable tracts embraced in the lists of swamp lands principally in the Ionia district, added: "And the same have been, as directed, marked as suspended on our books." Township No. 18, range 3, was not included in the above list, but, as already stated, was included in the original survey and certificate. The transaction is given as a sample of the methods by which the land grant was adjusted, and because of its particular relation to the lands involved in the present controversy. In the report of the commissioner of the state land office for the following year (1856), speaking of the swamp lands, he said: "Patents are now received for all these lands in the state except those situated in the Ionia land district, comprising about 1,200,-000 acres, and for these we are assured the patents will soon be forwarded, the making of which have been delayed in consequence of extensive resurveys by the general government, which in some instances change the amount and character of the land." "Public sale or offering has not been

deemed advisable until after the title of the state to the grant should be wholly confirmed by the issue of the patents, and the numerous corrections and restatements of the lists necessary to be previously made by the department at Washington."

Further correspondence between the officials of the state and the general government, and the several reports of the commissioner of the state land office during the years while the settlement of the grant was pending, show that the course above indicated was pursued throughout. The evidence on this subject is quite voluminous, and it is impracticable to do more than to state its general results. It is pertinent to add in this connection that the legislature of Michigan in 1857, in a law providing for the sale of the swamp lands coming to it by the grant, forbade the making of such sales until the patent therefor had been received from the United States. The proceedings for the adjustment of the grant went on until in 1869 the commissioner of the state land office reported that the entire amount of swamp lands conveyed to the state by the act of congress had been patented with the exception of about 35,000 acres in Cheboygan county, which consisted of an Indian reservation, the title thereto not having been extinguished. Some fugitive pieces have since that time been discovered and patented to the state, but the business was substantially closed as early as 1868. The lands in question and others in the same plight were sold at auction, after public advertisement, at the land office at Ionia, in November, 1869. No objection on behalf of the state appears to have been made to the sale. Upon the trial the plaintiff offered in evidence the records and files of a suit tried in 1849 in the circuit court of the United States for the district of Michigan, brought by the United States upon the bond of Nicholson, who surveyed the lands in suit, which resulted in a verdict for the defendant, and that, upon the question arising as to whether a new trial should be applied for, the surveyor general instructed the district attorney not to proceed further, upon the advice of the district attorney that the verdict would eventually be for the defendants; which offer was rejected by the court, and the plaintiff excepted.

J. W. Champlin and Frank E. Robson, for plaintiff in error.

Hanchett, Stark & Hanchett and W. L. Webber, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and SEVERENS. District Judge.

Having stated the case as above, SEVERENS, District Judge, delivered the opinion of the court.

The propositions upon which the plaintiff maintains its right to recover in this case are these, in substance:   First, that the swampland act of 1850 operated to convey the title to the lands proposed to be granted to the state in praesenti; second, that the ascertainment of the lands granted was delegated to the secretary of the interior to be performed by such method as he should deem expedient; third, that by his approval, and the certification thereof, of the list including these lands, and the transmission thereof to the governor of the state, January 13, 1854, the title attached to the lands, and became irrevocably vested in the state; fourth, that the subsequent transactions between the general government, and the state did not operate to impair the title thus vested.

It is further claimed that the act of 1857 operated to fix the title in the state if the lands had not been so identified that the title had already vested.   The latter claim will be discussed in another place.

The first of the above propositions must be conceded.   Whatever doubt may have once been entertained, such has become the establish-

ed doctrine as settled by a long line of decisions from Railway Co. v. Smith, 9 Wall. 95, to Iron Co. v. Cunningham, 155 U. S. 354, 15 Sup. Ct. 103. The second proposition may also be conceded. In a wide sense, it would be subject probably to some limitations which, for the purposes of this case, need not be stated. There can be no doubt that, while acting within the limits of his authority, the choice of methods was left to the secretary. The third and fourth propositions involve questions of vital and far-reaching import. If in the circumstances in which the swamp-land grant found the land surveys in Michigan, and as we understand, in some other states also, and in which the grant was adjusted in that state, and notwithstanding the co-operating action of the general government and the state in that adjustment, it is competent now to assert a title in the state which it is competent to convey, founded upon the original surveys and certifications long since superseded, because found erroneous or mistaken and contrary to the purpose of the law, the consequences may be very serious indeed. If all the land, whether swamp or arable, which was once certified upon the original fraudulent surveys, can now be claimed and sold by the state, it is obvious that much disturbance of titles and of what has since been done must ensue. The swamp lands in Michigan, owing to its peculiar topography, were widely scattered through the state. The land in the state of all descriptions has nearly all been sold, and it has been sold as finally surveyed after the discovered frauds were corrected. The old surveys and the new would not be uniform, but would overlap, or spread apart, leaving gores and fractions between. The lands in Michigan covered by this grant amounted to very nearly six millions of acres, being almost one-sixth of the entire area of the state.

In effect, the plaintiff's contention amounts to this: that no matter how gross the error or from what case proceeding, the secretary of the interior, when once he had certified a list of lands as falling due to the state under the grant, was without power to rectify it, though no patent had been issued and the rights of no third party had become involved by purchase from the state; and, further, that the secretary had no power to do this with the consent of the state. We do not think this doctrine can be sound. The identification of the lands affected by the grant was left to the secretary. The mode of doing this which was suggested by him involved concurrent action by the state. The proceedings on both sides should be construed in the light of existing circumstances, and not arbitrarily without regard to them. And the intention with which each step was taken and its purpose should be gathered from all that was mutually done and expressed with reference to the subject. Surely these rules are not too wide to be applied to a great governmental transaction like this. It was said by Judge Graves, in delivering the opinion of the supreme court of Michigan in Dale v. Turner, 34 Mich. 405, 416:

"There is no occasion to assail the position that the swamp-land act was sufficient to work an immediate transfer of the class of lands to which it was applicable; because, if it was so, it was still within the power of the

state and the United States, the parties to the grant, to agree, in the absence of any conflicting right, that sales made by the United States subsequent to the swamp-land act should be respected by the state, and be left to be completed by the United States by conveyance, and that the state should resort to the United States for equivalents."

This case, as does also that of State v. Flint & P. M. R. Co., 89 Mich. 481, 51 N. W. 103, asserts in an unequivocal manner the capacity of the state for active participation and negotiation in the settlement of the grant, and it would seem that its officials charged with the duty of acting in its behalf in that regard should be deemed its representatives.

While it is not now questioned that the act of 1850 transferred the title to the granted lands in praesenti, yet the identification of the lands so that the grant should attach to particular parcels was another matter, and whether a selection of lands was intended to be provisional or final was a question of intention to be gathered in the light of all the circumstances.　And while we cannot refer to the understanding with which the law was executed to construe the act of congress, we think it is competent, if such understanding of the law can be ascertained, to take it into consideration in determining the consequences intended by the parties from their acts.　It was not until the year 1869, when the case of Railway Co. v. Smith, 9 Wall. 95, was decided, that the doctrine now accepted in regard to the time when the title should be deemed to have vested under this grant was settled.　Differing views had been entertained, and in many quarters it was thought that the title did not vest until the issuance of the patent, as required by the second section of the act.　Now, we think no one can read the record of what was done in the administration of the grant in the state of Michigan without having a very strong impression that what was done was upon the understanding that the title would not pass until patents were issued,—or, to say the least, that it was thought that the safest way was to act upon that presumption,—and that the state as well as the secretary governed themselves accordingly.

The supreme court of Michigan, in Dale v. Turner, 34 Mich. 405, construed the act of the legislature of the state of June 28, 1851, adopting the field notes as the basis on which the grant would be received, as importing an understanding that the title would not be obtained until patents were received, and the whole tenor of the subsequent transactions indicates that this view continued to be held. What was done was regarded as part of a proceeding which was in fieri until the patent should be issued, and this was expected to come when the surveys were finally completed, and reliable data for making a just segregation of the swamp lands should be obtained.　We also think it clear that the field notes mentioned in the act last referred to were intended to be the lawfully established field notes, and not those which had been rejected, or having been impeached, would probably be wiped out.　It would have been a comparatively short piece of work to have simply made out the lists from the notes of the original survey.　It was for the interest of the state itself as well as of its citizens that the resurveys should be completed, and the

frauds of which it had complained should be corrected. It would then know what it was getting, marked and defined by an actual survey made by the recognized authority, and in harmony with the system upon which contiguous lands would be sold and owned, and, for its honor, that what was awarded to it was according to its rights, and not the fruit of fraud.

In passing, we may advert to a complication arising in the present case. The declaration describes the lands which it seeks to recover by the descriptions of the government survey, and this, without more, must be deemed to refer to the recognized and authorized survey. A judgment in its favor thereon would establish its title accordingly, and entitle it to be put in possession of the lands thus described, and the marshal would have no other guide than the description in the declaration and judgment. Whether that would correspond with the old survey, the court has no means of knowing. The presumption is that it would not, for the old was erroneous, and the new is presumptively correct.

For these and such reasons the state suspended from sale lands contained in selections already made, upon request of the commissioner of the general land office, and when new lists expressly intended, and known to be intended, to supersede the former selections, were received from the general land office, they were adopted by the state, and patents requested thereon by the state officials charged with that duty. The state also in its legislative capacity knew how the adjustment was going forward. The reports of the commissioner of the state land office showed it, and the legislature of 1857 enacted a statute to forbid sales of lands before patents were received. That statutory provision has ever since been in force. Section 2, Act No. 130, Laws Mich. 1883, upon which Sparrow obtained his patents for the lands here claimed by the plaintiff, seems to indicate that the lands appropriated by the state, and authorized to be patented, were lands which were subject to sale, and as these were not, because no patent had been received for them, we have difficulty in finding the authority by which the patent issued to Sparrow. This is a question not submitted by counsel, and therefore we do not pursue it. There are sporadic instances shown by the record where state officials have started suggestions of doubts whether the state was getting all it was entitled to, and of claims for more, but they were either never insisted upon by the state, or were settled by adjustment. We are therefore of opinion that it was not intended by the secretary of the interior, nor expected by the state, that the selection of swamp lands certified and transmitted to the governor on the 13th day of January, 1854, and which included the lands claimed by the plaintiff, should be necessarily final, but that it was intended to be subject to correction to the extent that the facts shown by the resurveys should require, and that, upon its being proven by the resurvey that these lands were not swamp, it was competent to supersede the selection by a correct one.

But, if this were not so, we should still be prepared to hold that where, as in this case, a selection had been made and approved

under a mistake of facts induced by a false and fraudulent survey, whereby lands had been certified which were not swamp, and to which the state had no right whatever, and the rights of no third party had intervened, it was competent for the secretary, on discovering the error at any time before issuing the patent, to correct the wrong by recalling his certifications; not upon "mere error of judgment, but that character of mistake which affords a ground of relief in a court of equity." State of Oregon, 5 Land Dec. Dep. Int. p. 31. The secretary under this grant would exercise his powers consistently with his general authority over the public lands. He had plenary and exclusive power to direct the surveys, to cancel such as he found erroneous, and to order resurveys as the necessities of every occasion should require. He had the power and was charged with the duty of supervising the method by which granted lands should be passed to the beneficiary. If mistakes were committed by his subordinates, the results of which, if suffered to stand, would be to accomplish a wrong, he had power to correct them. If they were made by himself, his duty was as plain and his power no less ample. "The obligations of his oath of office oblige him to see that the law is carried out, and that none of the public domain is wasted or is disposed of to a party not entitled to it. He represents the government, which is a party in interest in every case involving the surveying and disposal of the public lands." Knight v. Association, 142 U. S. 161, 181, 12 Sup. Ct. 258.

The secretary could not abdicate his functions. Nor could he assume any obligation by agreement with the state which would bind him in the discharge of his duty to the general government. The business in which he was engaged was not that of contract, but the exercise of a delegated authority. That duty rested upon him in the transmission of the lands intended by the grant. By the act in question the proceedings in his department extended from the first step to be taken for the identification of the lands to the issuance of the patent to the state, whereupon they became "subject to the disposal of the legislature thereof." The attorney general, in speaking of the patent required to be issued to the state by the second section, in 9 Op. Atty. Gen. 255, said: "The object of that clause was undoubtedly to prevent the legislature of the state from a premature interference with lands before they were so designated as to preclude mistake and confusion."

The secretary may prescribe methods, as he prescribed a method here, for the conduct of business, and "when proceedings affecting title to lands are before the department the power of supervision may be exercised by the secretary, whether these proceedings are called to his attention by formal notice or appeal, and it is sufficient that they are brought to his notice. The rules prescribed are designed to facilitate the department in the dispatch of business, not to defeat the supervision of the secretary. For example; if, when a patent is about to issue, the secretary should discover a fatal defect in the proceedings, or that by reason of some newly-ascertained fact the patent, if issued, would have to be annulled, and that it would be his duty to ask the attorney general to in-

stitute proceedings for its annulment, it would hardly be seriously contended that the secretary might not interfere and prevent the execution of the patent. He could not be obliged to sit quietly and allow a proceeding to be consummated, which it would be immediately his duty to ask the attorney general to take measures to annul. It would not be a sufficient answer against the exercise of his power that no appeal had been taken to him, and therefore he was without authority in the matter." Pueblo Case, 5 Land Dec. Dep. Int. 494.

So here, if the title of the state was irrevocably vested in this land by the certification of the secretary, and there was no duty left but the mere issuance of the patent notwithstanding the discovery of the mistake, he could have been compelled by the court to issue it. When issued, the court would not, under the settled rule, vacate it on account of the original mistake, for that had been discovered by the secretary before the patent was issued. Thus the mistake would be irretrievable. The language of the secretary in 5 Land Dec. Dep. Int. 494, last cited, was quoted and approved in Knight v. Association, 142 U. S. 178, 12 Sup. Ct. 258, and the doctrine fortified by reference to former decisions of the court, citing Maguire v. Tyler, 1 Black, 195, 8 Wall. 650, 661; Snyder v. Sickles, 98 U. S. 203, 211; Buena Vista Co. v. Iowa Falls & S. C. R. Co., 112 U. S. 165, 175, 5 Sup. Ct. 84. And it was further held in that case that the secretary could take action for the correction of such mistakes on his own motion, and that he need not await a contest. It cannot be denied that the power to do this is lodged somewhere. After the patent has issued, or when, under the granting act, no patent is required, all things contemplated by the act have been done, the court is the proper forum in which to deal with the case. But when the patent is required by the act it would seem that congress intended the secretary's supervision to continue until all things contemplated by the act have been accomplished by its issuance. This distinction in the jurisdiction has been adverted to in previous discussions, and appears to be a recognized and established one. It has certainly been acted upon for many years in the land department of the United States, and, although there is no express decision of the supreme court turning on the precise point, yet it has been clearly recognized in several cases as denoting the line between the boundaries of the jurisdiction of the department and of the courts.

Counsel for the plaintiff are mistaken in the suggestion which they make that the doctrine that the secretary has power to correct his own errors in certifying lands before patent originated with Secretary Lamar in 1886. It may be that there was never so definite and formal a promulgation of the doctrine before that time, but the record in the present case shows that it was asserted and acted upon many years before. It passed unchallenged at the time. It was then, and has continued to be, a rule by which the practice of the department has been governed. After the lapse of this long period we do not think it competent, at least unless the unlawfulness of the practice is clear and plain, for private individuals,

having no interest to protect, to buy into the ground of controversy and challenge the validity of a proceeding of this character, upon the foundation of which other interests have been established and now repose.

It is not claimed that these lands were in fact swamp, but the plaintiff founds its right upon the secretary's certification of the list in which they were included, as upon a judgment irrevocably concluding that question. The rule has often been stated and applied that when, under a grant transferring the title in praesenti, the lands have been identified in the manner prescribed by the act, the title to the particular lands so identified becomes vested in the grantee. But these are cases where all had been done which the statute contemplated as necessary to complete the title, or, if in any case it fell short of that, there were no countervailing equities. Some of the more recent cases on this subject are U. S. v. Schurz, 102 U. S. 401; Wright v. Roseberry, 121 U. S. 502, 7 Sup. Ct. 985; Cragin v. Powell, 128 U. S. 691, 9 Sup. Ct. 203; Tubbs v. Wilhoit, 138 U. S. 146, 11 Sup. Ct. 279; Williams v. U. S., 138 U. S. 514, 11 Sup. Ct. 457; Knight v. Association, 142 U. S. 161, 12 Sup. Ct. 258; Noble v. Railroad Co., 147 U. S. 165, 13 Sup. Ct. 271; and the case of Barden v. Railroad Co., 154 U. S. 288, 14 Sup. Ct. 1030, where in the opinions delivered there is a general discussion of the subject.

In the case of Noble v. Railroad Co., 147 U. S. 165, 13 Sup. Ct. 271, the secretary, on the approval of the location of the railroad, was functus officio. That was the only duty devolved upon him; and, further, it was not bound up in another subject over which he had general authority. Besides, from the nature of the subject, congress must have understood when making the grant there in question that the approval of the secretary would be presently acted upon by the railroad company, and a situation created where great hardship would ensue if the approval should be revoked. That being so, it was reasonable to regard the act as intending the secretary's approval to be final when once made. And in the case of Wright v. Roseberry, 121 U. S. 502, 7 Sup. Ct. 985, a case much relied on by the plaintiff, certain propositions are stated, which counsel take from the opinion and lay down upon this as rules and measures by which we should be governed in our decision. We do not question the correctness of the doctrines announced in that case, nor, if we did, should we feel at liberty to disregard its authority. But that case is to be construed, as all decisions are, by reference to the facts involved and the questions presented for decision, and not as an announcement of propositions which would be unaffected by other facts, and the application of other principles which the presence of such facts would involve. And, however correctly that case states the law, we must here take notice of "certain equitable considerations which the department is authorized to recognize"; and in regard to which, "when recognized, no court will ever disturb its action," as was said in Williams v. U. S., 138 U. S. 514, 523, 11 Sup. Ct. 457, in dealing with certain propositions relating to this general subject, the correctness of which was not doubted. What has been said is of general application to the cases cited.

The rulings of the interior department, at least in recent years, have uniformly maintained the right of the secretary to revoke a certification or other equivalent act before patent, on the ground that it had been inadvertently made and was erroneous in fact. Lachance v. State, 4 Land Dec. Dep. Int. 479; State of Oregon, 5 Land Dec. Dep. Int. 31, 300, 374; State of Minnesota, 6 Land Dec. Dep. Int. 37; State of Michigan, 7 Land Dec. Dep. Int. 514; State of Oregon, Id. 572; State v. Wolf, 8 Land Dec. Dep. Int. 555.    There are other decisions of the same import.    And there is no decision of the supreme court impugning that right, when exercised under an act of congress, contemplating a supervision of the proceedings until completed by the issuance of a patent.    On the other hand, the rulings of that court have been in conformity with the practice and decisions of the department.    On their own account these decisions of the department are very persuasive as to what the law is, and, as multitudes of titles have been founded upon them, they ought not to be disturbed except for very cogent reasons.    Railroad Co. v. Whitney, 132 U. S. 357, 10 Sup. Ct. 112; Knight v. Association, supra.

We now come to the consideration of the act of March 3, 1857 (11 Stat. 251).    That act provided that the selection of swamp and overflowed lands granted by the act of 1850 "heretofore made and reported to the commissioner of the general land office so far as the same shall remain vacant and unappropriated, and not interfered with by actual settlement under any existing law of the United States, be and the same are hereby confirmed and shall be approved and patented to the several states in conformity with the provisions of the act aforesaid as soon as may be practicable after the passage of this law."

Delays had occurred in the proceedings in the interior department for the ascertainment of the lands intended to be transmitted under the grant.    This act was passed to expedite them.    There is nothing in it which indicates any purpose to enlarge the grant.    Nearly all the states had chosen to select the lands for themselves, and to furnish proof that the lands were of the character mentioned in the granting act.    By the terms of the option extended to the states for the taking of lands under the grant, in case they were not taken by the field notes, the state authorities were required to furnish to the surveyor general satisfactory proof of the character of the lands included in their selections.    It is contended by counsel for the defendant that the act of 1857 was intended to apply to those cases only, and there is some plausibility in the argument made in support of that theory.    But, as it was customary to speak of the lists made up by the surveyor general in the states which elected to select their lands on the basis of the United States survey as "selections," it seems doubtful whether such selections were not included.    We shall not, however, decide that question, being of opinion that the act was not intended to include a list which was in the situation of the one under which the plaintiff claims.    The list had some time before been acted upon by the land department, and was expected to stand, except in so far as it should be impeached for fraud or error by the resurveys.    Congress knew that those resurveys were going on.    For

several years it had been making appropriations therefor. It was a matter of public record that the surveys on which it was based were fraudulent, and that, where the resurveys had developed the fraud and corrected the errors, all traces of the old survey were obliterated. The old survey had been rejected by competent authority. As was said in Knight v. Association, supra, a rejected survey is no survey, and inoperative for any purpose. New lists had been made and filed in the commissioner's office based upon the new survey, and the plats made in conformity therewith. It was held by the secretaries of the interior, and we think with sufficient reason, that the act was not intended to confirm old lists founded upon the first survey which had been thus superseded. It was so held by Secretary Vilas in State of Michigan, 7 Land Dec. Dep. Int. 525; by Secretary Noble in State of Arkansas, 8 Land Dec. Dep. Int. 387; and this is confirmed by the ruling of Secretary Thompson in 1 Lester's Land Laws, 560. And, further, we are of opinion that it was not intended by this act to override the general power of the secretary to correct frauds and mistakes in the preparation of the lists thereby confirmed, and that upon a just construction of the act such frauds and mistakes remained subject to correction.

Whether, upon the application of the doctrine of estoppel, the state should be held to be precluded by the acceptance of the new selection which was expressly confirmed as in lieu of the old one, and upon which new selection it accepted patents for other lands than those included in the first, we have not found it necessary to determine. It was held by the supreme court of that state upon similar facts in State v. Flint & P. M. R. Co., 89 Mich. 481, 51 N. W. 103, that the doctrine was applicable, and it was applied to an attempt made on behalf of the state to assert title to lands of which it had received an equivalent.

We think there was no error in the rejection by the court of the plaintiff's offers in evidence of the record of the suit of the United States against Nicholson and his bondsmen, in the circuit court of the United States for the district of Michigan. That case was not between the parties in the present suit, and could bind neither of them in respect to the subject-matter of this. Besides, there was nothing to show upon what facts the case turned, whether upon any circumstances relevant here or not. If the record of that suit had been admitted, it would have had no material effect, in view of the prime facts of the present case. The other exceptions relate in the main to the admission in evidence of public documents of which we should take judicial notice, and to the correspondence of public officials pertinent to the matters in controversy. None of the rulings excepted to were injurious to the plaintiff, whether any of them were technically erroneous or not. The case was rightly argued upon its main features, and we decide the case by reference to them. For the reasons stated, we think the judgment should be affirmed.